874 F.2d 332
 29 ERC 1864, 57 USLW 2665, 19 Envtl.
L. Rep. 20,888
 HER MAJESTY THE QUEEN IN RIGHT OF THE PROVINCE OF ONTARIO;
Ian G. Scott, Attorney General for Ontario; and James
Bradley, Minister of the Environment of the Province of
Ontario, Plaintiffs-Appellants (88-1217),
The Detroit Audubon Society; the North Cass Community
Union; the Sierra Club; and the Environmental
Defense Fund, Plaintiffs-Appellants (88-1268),
v.
The CITY OF DETROIT; the Greater Detroit Resource Recovery
Authority; and Combustion Engineering, Inc.,
Defendants-Appellees.
 Nos. 88-1217, 88-1268.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 6, 1989.
Decided May 2, 1989.
Rehearing and Rehearing En Banc Denied in No. 88-1217 July 31, 1989.
 
 Donnelly W. Hadden (argued), Donnelly W. Hadden, P.C., Detroit, Mich., Jeffrey K. Haynes, Vanderkloot & Haynes, P.C., Bloomfield Hills, Mich., for plaintiffs-appellants in No. 88-1217.
 John D. Pirich (argued), Miller, Canfield, Paddock & Stone, Lansing, Mich., for Greater Detroit Resource Recovery Authority.
 Kevin R. Sullivan, Stanley M. Gorinson, Pillsbury, Madison & Sutro, Washington, D.C., C. Douglas Floyd, Pillsbury, Madison & Sutro, San Francisco, Cal., Darryl F. Alexander, Susan Lynn Johnson, Detroit, Mich., for Combustion Engineering, Inc.
 Mark Richardson, Detroit, Mich., Michale Herz, New York City, for plaintiffs-appellants in No. 88-1268.
 Donald Pailen, City of Detroit Corporate Counsel, Detroit, Mich., for City of Detroit and Combustion Engineering, Inc.
 Elizabeth S. Harris, Birmingham, Mich., for amicus curiae, East Michigan Environmental Action Council.
 Deborah LaBelle, Thomas W. Stephens, Detroit, for amicus curiae, National Lawyers Guild.
 Before: MILBURN and BOGGS, Circuit Judges, and CONTIE, Senior Circuit Judge.
 MILBURN, Circuit Judge.
 
 
 1
 Plaintiffs-appellants in No. 88-1217 are the Canadian Province of Ontario, the Attorney General for Ontario, and the Minister of the Environment for Ontario (hereinafter collectively referred to as "Ontario"). Plaintiffs-appellants in No. 88-1268 are four nonprofit organizations concerned with the environment (hereinafter collectively referred to as "Detroit Audubon"). Defendants in both actions are the Greater Detroit Resource Recovery Authority ("GDRRA"), a municipal corporation which has as its sole purpose the construction of a municipal solid waste combustion facility in Detroit, Michigan; Combustion Engineering, Inc. ("Combustion"), the construction company retained to build that facility; and the City of Detroit.
 
 
 2
 In both actions plaintiffs appeal from orders of the district court denying their respective motions to remand these actions which had been removed from state court, and from the district court's granting the defendants' motions for summary judgment and dismissing both actions. The principal issue on appeal is whether these consolidated actions were improvidently removed from state court. For the reasons that follow, we hold that they were improvidently removed.
 
 I.
 
 3
 These consolidated appeals involve what will be the nation's largest municipal trash incinerator presently under construction in Detroit, Michigan, and scheduled for completion in the spring or summer of 1989. It will process raw garbage into refuse dry fuel (RDF). Burning the RDF in three boilers, the facility will produce steam for sale to Detroit Edison.
 
 
 4
 The plant is being built and will be operated by Combustion under contract to GDRRA. GDRRA has in turn contracted with the City of Detroit for delivery of waste. The facility was funded by a $438 million bond issue. In addition to paying the debt service on the bonds issued to finance construction, the GDRRA must pay Combustion a fixed annual fee covering Combustion's labor and other costs and Combustion will pass through to GDRRA its expenses for fuel, insurance, maintenance, residue hauling and disposal, and other operating costs. The City, in turn, will pay a variable service fee to GDRRA reflecting whatever amount GDRRA owes to Combustion.
 
 
 5
 In November of 1984, the Michigan Department of Natural Resources ("MDNR") issued a permit authorizing construction of the project. The plaintiffs in these actions did not participate in the administrative proceedings leading to the issuance of the permit. The MDNR permit is required by the Michigan Air Pollution Act. Mich.Comp.Laws Ann. Secs. 336.11-336.36 (West 1980). That Act and the rules issued thereunder forbid any person to construct or operate an air contaminant source without permits from the Michigan Air Pollution Control Commission ("MAPCC").
 
 
 6
 The United States Environmental Protection Agency ("EPA") has determined that Michigan's state-permitting procedure satisfies certain Clean Air Act permitting requirements, and formally delegated permitting authority to the State of Michigan in 1980. Accordingly, the MDNR permit served as both the permit required by the Michigan Air Pollution Control Act and the permit required by the Clean Air Act ("CAA"). 42 U.S.C. Secs. 7401-7626.
 
 
 7
 On May 8, 1986, Detroit Audubon informed the EPA and the defendants that it considered the permit deficient and threatened a lawsuit should the EPA not revoke the permit. Detroit Audubon contended that the EPA had a nondiscretionary duty to prevent construction of the facility given the invalidity of the permit. On May 20, 1986, the EPA announced plans to commence administrative proceedings to review, modify, and/or revoke the previously issued permit. Combustion, the City of Detroit, and GDRRA then filed an action in the United States district court seeking to enjoin the planned rulemaking. Greater Detroit Resource Recovery Authority v. Adamkus, 677 F.Supp. 521 (E.D.Mich.1987). They contended that the EPA lacked authority to review a previously issued CSA permit at such a late date. That case was assigned to the same district judge who was later assigned the consolidated cases now before us on appeal.
 
 
 8
 Detroit Audubon and Ontario sought to intervene in Adamkus. Their motions were denied, however, because the district court concluded that the only issue in the case was the scope of the EPA's authority, not air quality generally, and that the plaintiffs therefore had no interest in the action. On October 21, 1986, the district court granted summary judgment against the EPA. It enjoined the agency from any action or attempt to revoke the facility's MDNR permit, and the EPA did not appeal from that judgment. The district court subsequently entered an order holding that the EPA's legal position was not substantially justified, that it had acted in bad faith, and that the defendants were therefore entitled to attorneys' fees and costs. Greater Detroit Resource Recovery Authority v. Adamkus, 677 F.Supp. 521, 528 (E.D.Mich.1987).
 
 
 9
 On April 15, 1987, Ontario and Detroit Audubon filed separate and independent actions in Wayne County, Michigan, Circuit Court. The Detroit Audubon complaint asserted two causes of action, both of which were based on the Michigan Environmental Protection Act ("MEPA"), Mich.Comp.Laws Ann. Secs. 691.1201-.1207 (West 1987). Count I alleged that the incinerator would pollute or impair the natural resources of the state of Michigan through emissions of air pollutants and through the disposal of ash residues. Count II alleged that the City of Detroit had failed to fulfill its duty under MEPA to determine whether there exist prudent and feasible solid waste disposal alternatives to construction of the incinerator and/or modifications to its design that would avoid or reduce environmental pollution. Ontario filed a similar though narrower MEPA complaint. The Ontario complaint challenged only the adequacy of the air pollution control equipment plan for the incinerator.
 
 
 10
 On April 24, 1987, the defendants removed both actions to the district court. Detroit Audubon and Ontario filed motions to remand asserting that their actions were based solely on state law. The district court denied the motions, holding that the CAA preempted the state law claims and concluded that the plaintiffs had engaged in "artful pleading" in a purposeful attempt to avoid federal court jurisdiction of a claim that was essentially federal in nature. The plaintiffs then moved for certification of the order denying remand for an immediate appeal to this court. The district court held this motion in abeyance pending a decision on the defendants' motion for summary judgment, which was filed on September 11, 1987. On December 31, 1987, Detroit Audubon filed a second motion to remand.
 
 
 11
 On February 24, 1988, the district court decided all pending motions. It granted defendants' motions for summary judgments in both actions, 696 F.Supp. 249, denied Detroit Audubon's second motion to remand, and denied both motions to certify the initial remand denial for interlocutory appeal.
 
 
 12
 The district court concluded that Ontario lacked standing to bring a suit under MEPA and, in any event, that Ontario's claims were barred by the doctrine of laches because of its delay in bringing its action. The court concluded that the aspects of the project were known to Ontario as early as September of 1984, and that the inexcusable delay was prejudicial to the defendants. Finally, the district court alternatively concluded that Ontario failed to state a claim under any legal theory, federal or state.
 
 
 13
 As to Detroit Audubon's claims, the district court concluded that they were also barred by laches for the same reasons as Ontario's action, and also held that Detroit Audubon had failed to state a claim under either federal or state law. Specifically, the district court concluded that both plaintiffs' claims were an attempt to have the court review the project's permit in order to make a de novo determination that there was a better alternative to the pollution control technology employed. Finally, the district court held that the fact that a valid permit had been given created an irrebuttable presumption that no prudent alternatives were available. Ontario's and Detroit Audubon's timely appeals followed.
 
 II.
 A. The Clean Air Act
 
 14
 The CAA sets out a comprehensive regulatory scheme designed to prevent and control air pollution. The Act directs the EPA to prescribe national air quality standards at a level sufficient to protect the public health and welfare. 42 U.S.C. Secs. 7409(a), (b). Each state is required to adopt an implementation plan of its own for that state. 42 U.S.C. Sec. 7410(a). If a state implementation plan ("SIP") is approved by the EPA, its requirements become federal law and are fully enforceable in federal court. See 42 U.S.C. Sec. 7604(a); see generally 1 W. Rodgers, Environmental Law: Air and Water Secs. 3.9-3.11 (1986). The Michigan SIP has been approved by the EPA.
 
 
 15
 The basic requirement of an acceptable SIP is that it provide for emission limitations and other measures necessary to achieve and maintain national air standards, including a permit program to enforce limitations against new sources of pollution. 42 U.S.C. Sec. 7410(a)(2)(B), (D). For pollutants as to which the air quality in an area does not meet national standards ("nonattainment areas"), the plan must provide that new source permits will be issued only if, among other things, the new source meets the "lowest achievable emission rate" ("LAER") for those pollutants. 42 U.S.C. Sec. 7503.[1] For pollutants as to which the air quality meets national standards ("attainment areas"), permits for major emitting facilities must be issued in compliance with the prevention of significant deterioration ("PSD") requirements of the CAA, the basic component of which is that the facility must be subject to the "best available control technology" ("BACT"). 42 U.S.C. Sec. 7475(a)(4). BACT is determined on a case-by-case basis for each pollutant regulated under the CAA, taking into account energy, environmental, and economic impacts and other costs. 42 U.S.C. Sec. 7479(3).
 
 
 16
 The Clean Air Act established only minimum air quality levels, however, and states are free to adopt more stringent protections. Section 116 of the CAA, 42 U.S.C. Sec. 7416, provides:
 
 
 17
 [N ]othing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 7411 or section 7412 of this title, such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.
 
 
 18
 42 U.S.C. Sec. 7416 (emphasis supplied). The CAA, which provides for citizen suits, 42 U.S.C. Sec. 7604(a)(1), also contains a savings clause which reads as follows:
 
 
 19
 (e) [n ]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency). Nothing in this section or in any other law of the United States shall be construed to prohibit, exclude, or restrict any State, local, or interstate authority from--(1) bringing any enforcement action or obtaining any judicial remedy or sanction in any State or local court, or (2) bringing any administrative enforcement action or obtaining any administrative remedy or sanction in any State or local administrative agency, department or instrumentality, against the United States, any department, agency, or instrumentality thereof, or any officer, agent, or employee thereof under State or local law respecting control and abatement of air pollution.
 
 
 20
 42 U.S.C. Sec. 7604(e) (emphasis supplied).
 
 
 21
 The EPA's regulations provide that the PSD condition or standard issued by a state agency under a delegation agreement such as Michigan's can be appealed to the EPA administrator within thirty days of permit issuance. See 40 C.F.R. Sec. 124.19(a) (1987). The administrator's decision is then subject to judicial review. 42 U.S.C. Sec. 7607(b).
 
 B. The Michigan Air Pollution Act
 
 22
 The Michigan Air Pollution Act creates the Michigan Air Pollution Control Commission ("MAPCC") and empowers it to establish emission standards and to issue permits.[2] Mich.Comp.Laws Ann. Secs. 336.13, 336.15 (West 1980). The MAPCC is further directed to adopt rules to control or prohibit pollution. Mich.Comp.Laws Ann. Sec. 336.17(2) (West 1980).
 
 
 23
 The MAPCC rules adopted pursuant to these provisions, which are part of the state's SIP, implement the requirements of both the CAA and state law. They incorporate the appropriate federal standards, including LAER and the EPA standards of performance for new stationary sources. See 40 C.F.R. Pt. 60 (1987). They also require that no facility shall receive a permit unless its operation will comply with all applicable state laws. Accordingly, a permit issued by the MAPCC is designed to satisfy both federal and state air pollution requirements as they have been incorporated into the state's federally approved SIP. In this case, the plaintiffs concede that the MDNR air permit issued to GDRRA served as the permit required under both state and federal law.
 
 
 24
 C. The Michigan Environmental Protection Act
 
 
 25
 MEPA, enacted in 1970, creates a cause of action in any person or entity against any person or entity "for the protection of the air, water and other natural resources and the public trust therein from pollution, impairment or destruction." Mich.Comp.Laws Ann. Sec. 691.1202. It is based upon Article 4, section 52, of the Constitution of the State of Michigan, which provides:
 
 
 26
 The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people.
 
 
 27
 In addition to creating procedural rights, MEPA imposes a substantial duty on all persons and entities, public and private, to prevent or minimize environmental degradation caused by their activities. See Ray v. Mason County Drain Comm'r., 393 Mich. 294, 224 N.W.2d 883 (1975). As explained by the Michigan Supreme Court:
 
 
 28
 The Legislature in establishing environmental rights set the parameters for the standard of environmental quality but did not attempt to set forth an elaborate scheme of detailed provisions designed to cover every conceivable type of environmental pollution or impairment. Rather the Legislature spoke as precisely as the subject matter permits and in its wisdom left to the courts the important task of giving substance to the standard by developing a common law of environmental quality.
 
 
 29
 Id., 393 Mich. at 306, 224 N.W.2d at 888. Thus, the essence of MEPA is allowing individuals or groups a state judicial venue for challenging agency action. Plaintiffs contend that MEPA is the sole action available when a permit has been issued and one seeks to demonstrate that, independent of a permit, there is likelihood of pollution.
 
 
 30
 The plaintiff in a MEPA action must make out a prima facie case by establishing that the defendant "has, or is likely to pollute, impair or destroy the air, water or other natural resources or the public trust therein...." Mich.Comp.Laws Ann. Sec. 691.1203 (West 1987). The burden then shifts to the defendant to rebut the prima facie case with evidence to the contrary. The defendant may show, as an affirmative defense, "that there is no feasible and prudent alternative to defendant's conduct and that such conduct is consistent with the promotion of the public health, safety and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment or destruction." Id.
 
 
 31
 MEPA is supplementary to existing administrative and regulatory procedures provided by law. Mich.Comp.Laws Ann. Sec. 691.1206 (West 1987). It specifically authorizes the court to determine the validity, applicability, and reasonableness of any standard for pollution or pollution control equipment set by state agency and to specify a new or different pollution control standard if the agency's standard falls short of the substantive requirements of MEPA. Mich.Comp.Laws Ann. Secs. 691.1202(2)(a), (b) (West 1987). As the Michigan Supreme Court held in Ray:
 
 
 32
 The Act allows the courts to fashion standards in the context of actual problems as they arise in individual cases and to take into consideration changes in technology which the Legislature at the time of the Act's passage could not hope to foresee.
 
 
 33
 Ray, 393 Mich. at 306-07, 224 N.W.2d at 888. Thus, the Michigan legislature has clearly left to the state courts the task of giving substance to MEPA by developing a state common law of environmental quality. See West Michigan Envtl. Action Council v. Natural Resources Comm'n., 405 Mich. 741, 752, 275 N.W.2d 538, 542, cert. denied, 444 U.S. 941, 100 S.Ct. 295, 62 L.Ed.2d 307 (1979).
 
 
 34
 In reviewing administrative agency action in a MEPA suit, it is error for the trial court to defer to the expertise of the agencies. Rather, the court must exercise its independent judgment as to whether the agency activity prevents the likelihood of pollution, impairment or destruction claimed by the plaintiffs. West Michigan Envtl. Action Council, 405 Mich. at 753-54, 275 N.E.2d at 542. This de novo review feature of MEPA is based on the fact that, as recognized by Michigan's Supreme Court, "not every public agency proved to be diligent and dedicated defenders of the environment." Ray, 393 Mich. at 305, 224 N.W.2d at 887. In sum, "MEPA has provided a sizable share of initiative for environmental law enforcement for the segment of society most directly affected--the public." Id., 393 Mich. at 305, 224 N.W.2d at 888.
 
 III.
 A. Standard of Review
 
 35
 In this court's recent decision in Striff v. Mason, 849 F.2d 240 (6th Cir.1988), we examined the propriety of removal de novo, and did not give any special deference to the district court decision.[3] While this circuit has never directly addressed the question, it is clear from our prior decisions that we review denials of remand motions de novo. See, e.g., Miller v. Norfolk & Western Ry. Co., 834 F.2d 556 (6th Cir.1987); Thompson v. Merrell Dow Pharmaceuticals, Inc., 766 F.2d 1005 (6th Cir.1985), aff'd, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986).[4]
 
 B. Artful Pleading
 
 36
 Although the district court acknowledged that the plaintiffs' complaints do not facially raise any issues of federal law, it concluded that the complaint raised issues that were federal in character and therefore properly removable to federal court. In Caterpillar, Inc. v. Williams, 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987), the Court set forth the jurisdictional framework governing removal of federal question cases from state into federal courts:
 
 
 37
 Only state court actions that originally could have been filed in federal court may be removed to federal court by the defendant. Absent diversity of citizenship, federal question jurisdiction is required. The presence or absence of federal-question jurisdiction is governed by the "well pleaded complaint rule," which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law.
 
 
 38
 482 U.S. at 392, 107 S.Ct. at 2429 (citations and footnotes omitted). The Court continued:
 
 
 39
 Thus, it is now settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue.
 
 
 40
 Id., 482 U.S. at 393, 107 S.Ct. at 2430.
 
 
 41
 However, an exception to the well pleaded complaint rule exists when plaintiffs "artificially plead" their complaint in order to avoid federal jurisdiction of claims that are federal in nature. See Federated Department Stores, Inc. v. Moitie, 452 U.S. 394, 397 n. 2, 101 S.Ct. 2424, 2427 n. 2, 69 L.Ed.2d 103 (1981); 14A C. Wright, A. Miller and E. Cooper, Federal Practice and Procedure Sec. 3722 at 270 (1985). If it appears "that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims" or if plaintiff's claim is "really one of federal law," then the matter is properly in federal court. Franchise Tax Board v. Laborers Vacation Trust, 463 U.S. 1, 13, 103 S.Ct. 2841, 2848, 77 L.Ed.2d 420 (1983). The party seeking removal bears the burden of establishing its right thereto. Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97-98, 42 S.Ct. 35, 37-38, 66 L.Ed. 144 (1921). The removal petition is to be strictly construed, with all doubts resolved against removal. See Wilson v. USDA, 584 F.2d 137, 142 (6th Cir.1978).
 
 
 42
 In Striff, we applied the artful pleading rule in an action involving a federal consent decree. Striff involved an action against city officials by a Toledo, Ohio, police officer who had been passed up for promotion. The action arose against the background of lengthy litigation in federal court over racial discrimination within the Toledo police and fire departments. That litigation had led to a comprehensive consent decree covering all aspects of recruitment and promotion practices. Striff's state court action sought and initially obtained an injunction against all promotions pursuant to the consent decree. The defendants then removed the action to federal district court, and plaintiff's motion to remand was denied. On appeal, we affirmed, rejecting Striff's argument that remand to state court was required because his complaint made no reference to nor sought any relief pursuant to federal law.
 
 
 43
 We held that "[t]he well-pleaded complaint rule is not absolute," and that "an action may be removed 'where the real nature of the claim asserted ... is federal, irrespective of whether it is so characterized.' " Striff, 849 F.2d at 244 (quoting 1A J. Moore & B. Ringle, Moore's Federal Practice Sec. 0.060[3.-3]. We further held that the state complaint had sufficient federal character to support removal:
 
 
 44
 [W]hat [plaintiff] actually sought, and received under the state court's temporary restraining order, was a complete cessation of all promotions to lieutenant. Since the consent decree covered all promotions and "the racial balance of the Police Division," its operation clearly was affected by the restraining order. The complaint also sought preliminary and permanent injunctions to the same effect. We conclude that the complaint demonstrates that [plaintiff's] claim was based on the banding method of selection for promotion that derived from the settlement of a federal action and that the relief he sought had a direct and adverse impact upon the federal court decree enforcing federal civil rights laws.
 
 
 45
 Id. at 244. In this case, the defendants contend that like the consent decree in Striff, the permit in this case represents a culmination of a lengthy process implementing both federal and state requirements, and, therefore, the state action was properly removable. We disagree.
 
 
 46
 The situation in Striff is not comparable to these consolidated actions. The law Striff sought to invoke (the rules of the Civil Service Commission) was itself the product of the federal consent decree. Striff, 849 F.2d at 244. Striff's action was inseparable from years of federal litigation, and the police department could not promote Striff and satisfy the requirements of the consent decree. Id. at 243. In this case, however, there is no inconsistency between the federal obligations as set out in the PSD permit and the relief sought by plaintiffs. In Striff, the consent decree required the plaintiffs to perform certain actions, while the federal instrument involved here, the permit, merely permits the defendants to build their incinerator. Undeniably, federal law does allow the defendants to build their incinerator. However, the plaintiffs' argument is that the MEPA nonetheless forbids them to build it as planned. Thus, the plaintiffs' actions are not an attack on the permit; they are an attack on the project.
 
 
 47
 Other circuits have elaborated on the interplay between removal jurisdiction and the "artful pleading" doctrine. In United Jersey Banks v. Parell, 783 F.2d 360 (3d Cir.), cert. denied, 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 979 (1986), the Third Circuit cautioned against the application of the artfully pleaded complaint doctrine, which would oust the plaintiff of its traditional right to control the complaint. In declining to apply the "artfully pleaded" complaint doctrine to a case involving a bank takeover and remanding the state cause of action, the court held:
 
 
 48
 The Court in Franchise Tax Board distinguished the case before it from cases where the "real" nature of the claim is federal, which it illustrated by reference to Avco Corp. v. Aero Lodge No. 735, International Association of Machinists, 390 U.S. 557 [88 S.Ct. 1235, 20 L.Ed.2d 126] (1968) [arising under section 301 of the LMRA which displaces entirely any state cause of action for violation of a contract between an employee and a labor organization].... Using similar reasoning, United Jersey's suit does not "arise under" any federal statute. The fact that United Jersey's claim under state law may be defeated because of the preemptive effect of federal banking laws does not mean that such federal laws provide the basis of the cause of action, as in the case of Sec. 301 of the LMRA.
 
 
 49
 Id. at 367. The Third Circuit then cautioned against expansive application of the artful pleading doctrine:
 
 
 50
 Unless applied with circumscription, the artful pleading doctrine may raise difficult issues of federal-state relations. An expansive application of the doctrine could effectively abrogate the rule that a plaintiff is master of his or her complaint. Those courts of appeal that have applied the doctrine have done so primarily in the context of Sec. 301 of the Labor Management Relations Act, not only because the extent of federal primacy is well established, but because all state law is displaced. Whatever the ultimate limits of the artful pleading doctrine, this case is governed by the general rule that federal jurisdiction will not be found when the complaint states a prima facie claim under state law.
 
 
 51
 Id. at 368 (citations omitted and emphasis supplied).
 
 
 52
 Where federal and state claims are not identical, the artful pleading doctrine has been held not to apply. See Travelers Indemnity Co. v. Sarkisian, 794 F.2d 754, 760-61 (2d Cir.), cert. denied, 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986). For example, even a requirement by federal law to operate a railroad does not confer federal jurisdiction over an otherwise well-pleaded state law claim. See Zimmerman v. Conrail, 550 F.Supp. 84, 86-87 (S.D.N.Y.1982).
 
 
 53
 In People of Illinois v. Kerr-McGee Chem. Corp., 677 F.2d 571 (7th Cir.), cert. denied, 459 U.S. 1049, 103 S.Ct. 469, 74 L.Ed.2d 618 (1982), the state of Illinois sued under its Environmental Protection Act, Ill.Rev.Stat. ch. 111 1/2, Sec. 1001 et seq., and other state statutes pertaining to the disposal of hazardous waste to force defendant Kerr-McGee to abate the nuisance resulting from the decommissioning and abandonment of factory sites used for refining various compounds from radioactive natural ores and the improper disposal of the large quantity of waste such processes produced. Because many of the defendants' operations are subject to regulation by the Nuclear Regulatory Commission, the defendants removed the action to federal district court. Even though it is undisputed that federal regulation of nuclear power is more pervasive than regulation under the CAA, the Seventh Circuit held that a plaintiff's reliance on its own state environmental protection law to guard the safety and health of its citizenry did not provide "any basis for concluding that the state has artificially drafted its complaint in order to defeat removal." Id. at 577.
 
 
 54
 Conceding that the plaintiffs are proceeding under only a state statute, MEPA, the defendants argue that the state action is still federal in nature because the plaintiffs' claim has been absorbed into federal law. The defendants claim that MEPA is a federal law for jurisdictional purposes because it is part of Michigan's SIP, and certain parts of a SIP are enforceable in federal court. Moreover, as stated above, citizens may sue in federal court to enforce specific emission standards or limitations contained in a SIP.
 
 
 55
 However, MEPA is not the sort of SIP requirement that is generally deemed federal law. First, as the plaintiffs correctly note, it is not truly part of the SIP at all. It is simply noted as part of the authority for Wayne County, Michigan, to enforce its air pollution laws. However, even if MEPA could be said to be part of the Michigan SIP, it is still not transformed into federal law.
 
 
 56
 MEPA does not impose the sort of specific requirements for emission standards or limitations that are enforceable by the CAA. Instead, it is a state statute that provides de novo review in state courts, allows the state courts to determine any adverse environmental impact, and to take appropriate measures. Michigan courts are not bound by any state administrative finding, or any federal law. Even though the federal government may determine that a plant is not in violation with either state or federal environmental laws, Michigan courts are still empowered to determine whether the standards applied by the federal government are appropriate and if not, determine whether the plant would meet any more stringent standards selected by the Michigan courts. In sum, MEPA creates a state environmental common law that is unaffected by federal law, and creates an independent state action that is unaffected by anything that happens in the federal sphere of government. Accordingly, plaintiffs' complaints do not meet the "artful pleading" doctrine.
 
 
 57
 The defendants also contend that the plaintiffs' state actions represented a collateral attack on the federal permit and that the plaintiffs simply recast their federal claims under the MEPA. The defendants are essentially making a collateral estoppel argument in that they contend that the origins and substance of plaintiffs' complaints reveal that their central allegations have been previously aired and conclusively determined against plaintiffs in prior proceedings, wherein it was determined that the defendants' permit was in compliance with both federal and state law. However, there has never been any prior litigation between the parties, and there has never been a judicial determination that the defendants' conduct complies with MEPA. The defendants are seeking to rely on administrative determinations of purported compliance, but these determinations are not binding on the Michigan courts under MEPA, as was noted above.
 
 
 58
 The defendants assert that the plaintiffs should have intervened in the Adamkus case, and failing to do so, should be barred from seeking further review. As the district court noted in denying the defendants' motions to intervene, Adamkus raised only the EPA's authority to reconsider the validity of a permit previously issued. It was merely a question of federal procedural law, and in no way did it concern the propriety of the prior issued EPA permit. Moreover, the plaintiffs are not alleging any defect in any previous court decree or holding, but are instead seeking a completely independent, de novo review under MEPA to determine whether or not the incinerator would pollute or impair the environment.
 
 
 59
 Finally, the Supreme Court's holding in Moitie, relied upon by the defendants, does not support removal in this case. In Moitie, the Supreme Court upheld the removal of a state court action challenging retail price-fixing in the clothing industry. The plaintiff had already lost an antitrust action based on precisely the same facts in federal court. The Court upheld removal in one brief footnote, devoting almost the whole opinion to a determination that the second action was barred by res judicata. Moitie, 452 U.S. at 397 n. 2, 101 S.Ct. at 2427 n. 2.
 
 
 60
 The defendants argue that the permit proceeding before the MAPCC constitutes a "prior adverse determination" equivalent to the prior adverse court judgment involved in Moitie. However, courts applying Moitie have made it quite clear that it applies only to the removal of state claims barred by a prior federal judgment. See Sullivan, 813 F.2d at 1376. There is no such judgment in this case. Moreover, the permit proceeding was not a prior adverse determination of plaintiffs' claims. That proceeding developed a number of emission limits based on the CAA and the Michigan Air Pollution Act, but it did not involve the range of environmental concerns raised by the plaintiffs, nor any specific limits based on MEPA. As the Second Circuit recognized in Travelers Indemnity, the holding in Moitie cannot be read as requiring "that a plaintiff's state law claim be recharacterized as a federal claim whenever it arises out of the same transaction as a prior federal claim...." Travelers Indemnity, 794 F.2d at 761 n. 10.
 
 C. Complete Preemption
 
 61
 Another exception to the well-pleaded complaint rule, the complete preemption doctrine, exists where federal law has entirely preempted the field in question. As the Supreme Court recently reiterated, complete preemption exists when "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.' " Caterpillar, Inc., 482 U.S. at 393, 107 S.Ct. at 2430 (quoting Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 64, 107 S.Ct. 1542, 1547, 95 L.Ed.2d 55 (1987)). However, state claims are preempted and therefore removable to federal court only when there is a "clearly manifested" intent by Congress. Metropolitan Life, 481 U.S. at 66, 107 S.Ct. at 1548. As the plaintiffs correctly note, the only instances in which the Supreme Court has found complete preemption have been (1) in relation to section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. Sec. 185; (2) concerning the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Secs. 1001-1461; and (3) concerning Indian rights, see Oneida Indian Nation of New York State v. County of Oneida, 414 U.S. 661, 675, 94 S.Ct. 772, 781, 39 L.Ed.2d 73 (1974).
 
 
 62
 Initially, we note that it is clear that the district court erred in holding that the Clean Air Act preempted any action under MEPA regarding pollution standards. As the Supreme Court noted in Washington v. General Motors Corp., 406 U.S. 109, 92 S.Ct. 1396, 31 L.Ed.2d 727 (1972):
 
 
 63
 Air pollution is, of course, one of the most notorious types of public nuisance in modern experience. Congress has not, however, found a uniform, nationwide solution to all aspects of this problem and, indeed, has declared "that the prevention and control of air pollution at its source is the primary responsibility of States and local governments." To be sure, Congress has largely pre-empted the field with regard to "emissions from new motor vehicles," and motor vehicle fuels and fuel additives. It has also pre-empted the field so far as emissions from airplanes are concerned. So far as factories, incinerators, and other stationary devices are implicated, the States have broad control....
 
 
 64
 Id. at 114, 92 S.Ct. at 1398 (citation omitted and emphasis supplied). As noted above, the CAA displaces state law only to the extent that state law is not as strict as emission limitations established in the federal statute.
 
 
 65
 Moreover, the plain language of the CAA's savings clause compels the conclusion that neither of the groups of plaintiffs are precluded by the CAA from pursuing claims under MEPA. It clearly indicates that Congress did not wish to abolish state control.
 
 
 66
 The district court concluded that the savings clause in question was irrelevant because the plaintiffs were not seeking to enforce an "emission standard or limitation." However, section 7604(e) expressly preserves actions under any statute not only to seek enforcement of emission standards, but to seek "any other relief." The district court was also concerned that there were no precise standards under MEPA for the Michigan courts to apply. However, the district court's holding indicates a misunderstanding about the operation of MEPA. Michigan state courts are not only authorized to enforce standards, they are also authorized to establish standards if they deem existing standards inadequate.
 
 
 67
 Finally, that Congress did not seek to preempt actions such as involved in this appeal is clearly indicated by the Court's holding in International Paper Co. v. Ouellette, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). In International Paper, the Court held that a savings clause in the Clean Water Act, 33 U.S.C. Sec. 1365(e), which defendants concede is identical to the savings clause at issue in this case, allows state law actions against water pollution notwithstanding the existence of federal law and standards. The Court held that the savings clause "negates the inference that Congress 'left no room' for state causes of action;" it "specifically preserves other state actions, and therefore nothing in the Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the source State." Id., 479 U.S. at 492, 496, 107 S.Ct. at 812, 814. The Court did find that Vermont plaintiffs could not sue the New York defendant under Vermont law but, instead, had to proceed under law of the source state. Id., 479 U.S. at 494-98, 107 S.Ct. at 813-14. In the present consolidated cases, however, the plaintiffs are suing a Michigan facility under Michigan law.
 
 
 68
 The district court held that International Paper was distinguishable. First, the district court noted the Supreme Court had not addressed the International Paper plaintiffs' air pollution claims. However, there was no reason to think that the result with regard to air pollution should be different. The opinion indicates that the air pollution claims were simply not before the court. Id., 479 U.S. at 484, 107 S.Ct. at 807 n. 2. Moreover, on remand, the International Paper district court did hold that the air pollution claims could proceed, concluding that the Supreme Court's holding applied equally to them. See Ouellette v. International Paper Co., 666 F.Supp. 58, 62 (D.C.Vt.1987).
 
 
 69
 The district court attempted to distinguish International Paper on the ground that the plaintiffs had not only asserted several claims under state law, but also alleged a violation of defendants' Clean Water Act permit. However, the Supreme Court's opinion does not mention the allegation of a federal permit violation, let alone indicate that it was of any importance. Had the Court meant to impose this type of qualifier, it surely would have said so.
 
 
 70
 In our view, the argument cuts the other way, because if anything, one would assume that there is less reason to allow a state action to proceed if there is a companion federal violation. If anything, the action in International Paper had more of a federal character to it than the ones before us.
 
 
 71
 In these consolidated appeals, obviously understanding the district court's error in concluding that the CAA preempted MEPA claims, the defendants argue instead that
 
 
 72
 [t]he district court's ruling on preemption in this case was quite limited. The court did not hold that the Clean Air Act in itself preempts state law claims. It merely held that the permitting process implementing both the requirements of the Clean Air Act and state law, once it is completed and a valid permit has been issued, completely preempts the imposition of retroactive redesign and reconstruction of the Project by private party litigation, contrary to the terms of the permit....
 
 
 73
 Defendants' Brief, No. 88-1217, at 34. Thus, the defendants acknowledge that this area of law has not been completely preempted by Congress, but argue only what we perceive to be a defense of federal preemption in that the federal government has already acted in this area. However, the fact that a preemption defense can be raised is not enough to justify removal. As the Supreme Court has made clear, removal can only be based on a theory advanced by the plaintiff. See Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 809, 106 S.Ct. 3229, 3233 n. 6, 92 L.Ed.2d 650 (1986). A defendant cannot create removal jurisdiction merely by raising a federal question as a defense. Garibaldi v. Lucky Food Stores, Inc., 726 F.2d 1367, 1370 (9th Cir.1984), cert. denied, 471 U.S. 1099, 105 S.Ct. 2319, 85 L.Ed.2d 839 (1985). The federal question "must be disclosed upon the face of the complaint, unaided by the answer." Phillips Petroleum Co. v. Texaco, Inc., 415 U.S. 125, 127-128, 94 S.Ct. 1002, 1003-04, 39 L.Ed.2d 209 (1974).
 
 
 74
 Moreover, as explained above, the plaintiffs' actions in state court, if successful, will not in any way alter or modify the validity of the federal permit previously issued. That permit will still be in existence, and will still be of full legal effect. If the plaintiffs succeed in state court, it will simply be an instance where a state is enacting and enforcing more stringent pollution controls as authorized by the CAA. With MEPA, the State of Michigan has created a mechanism under which more stringent limitations may be imposed than required by federal law. It is, by its terms, supplemental to other legal and administrative procedures and requirements, and in this case principles of comity and federalism require us to hold these MEPA actions are not preempted by federal law.
 
 IV.
 
 75
 Accordingly, the district court's orders denying remand are REVERSED, all subsequent judgments and orders are VACATED, and this action is REMANDED to the district court. On remand, the district court is instructed to remand these actions to the state court from which they were removed.
 
 
 76
 BOGGS, Circuit Judge, dissenting.
 
 
 77
 The State of Michigan, acting under explicit authority from the federal government and under the authority of its own laws, granted a permit for the construction of a one-half billion dollar refuse disposal project. Michigan, by issuing the permit, certified that construction of the project met all applicable state and federal air quality laws.
 
 
 78
 The plaintiffs here did not participate in this process in any way, and no appeals were taken from the decision, though both administrative and judicial review were available. A federal court has even ruled that these decisions were so final that the United States Environmental Protection Agency (EPA) could not go back and reopen the process, with the court assessing fees and costs against EPA for even claiming that it could. Greater Detroit Resource Recovery Authority v. Adamkus, 677 F.Supp. 521 (E.D.Mich.1987).
 
 
 79
 Now, four years after the last state proceeding, with the project perhaps complete by the time this opinion is published, we declare it a matter of no federal interest if a state court entertains litigation specifically designed to prevent the completion or operation of the plant under the state-federal permit. This result is compelled neither by the Clean Air Act, principles of comity, nor good sense, and I respectfully dissent.
 
 
 80
 The court holds that the Michigan Environmental Protection Act (MEPA), Mich.Comp.Laws Sec. 691.1202, gives the Michigan courts the authority to create a common law of environmental quality independent of any decisions made by state or federal agencies. The court also correctly notes that the Clean Air Act allows states to impose their own pollution control standards, as long as those standards are not less strict than the federal standards. Congress's decision to give states a role in the regulation of air pollution requires that federal courts allow state environmental actions against alleged polluters, even if those parties who are accused of polluting are in compliance with federal standards.
 
 
 81
 I do not dispute that MEPA gives Michigan courts the authority to impose their own environmental standards without regard to the actions of administrative agencies. Nor do I dispute that Congress intended that the states play a large role in the regulation of air pollution. The federal statutory scheme clearly contemplates that Michigan can make its air pollution rules as stringent as it likes, and may enforce those rules. 42 U.S.C. Sec. 7416. The statute contemplates that the state can exercise federal permitting powers through a federally approved implementation plan, specifically to allow the coordination of state and federal interests. But when all of the above has been done, and a permit issued under this federal scheme, it is an excess of "artful pleading" to allow a completely collateral attack on the construction of the plant itself, the very act sanctioned by the federal-state permit, to be carried out in state court.
 
 
 82
 Thus, my disagreement is as to when, not if, state rulings such as those sanctioned by MEPA should come into play. It is my view that the Clean Air Act's provision for state actions should not be construed in a manner that essentially eviscerates the permitting system created by the Act. By acquiescing in the plaintiffs' attempt to sue in state court to forestall the operation of a project that, after a long and costly process, has received a permit certifying that it will be in compliance with state and federal law, the majority has rendered that permit, and with it the scheme set up by the Clean Air Act, worthless.
 
 
 83
 To understand why this is so, one must understand the nature of the regulatory system established by the Clean Air Act. The Act, as the court recites, "sets out a comprehensive regulatory scheme designed to prevent and control air pollution." However, rather than mandating one set of federal standards, Congress wished states to devise their own state plans, incorporating both state and federal standards. These state implementation plans (SIPs) allow those parties desiring to build projects requiring approval under the Act to apply for one permit incorporating all the relevant state and federal standards. This permit then becomes federal law. United States v. Congoleum Corp., 635 F.Supp. 174, 177 (E.D.Pa.1986). Such a permit is only issued after study and ample opportunity for public comment. Within thirty days after the issuance of the permit, anyone objecting to the permit can seek review from the EPA. After this review, the EPA's decision is subject to judicial review.
 
 
 84
 Thus, the Act establishes a relatively coherent, rational system for dealing with air pollution. The proponents of each proposed project must apply for and receive a permit certifying that the project as permitted is in compliance with both federal and state laws. It is the combined federal and state character of the permit that makes any litigation seeking to challenge these standards, whether under MEPA or the Clean Air Act, a question of federal law, requiring the exercise of federal jurisdiction over claims that would normally be state claims.
 
 
 85
 This case is, thus, similar to Striff v. Mason, 849 F.2d 240, 244 (6th Cir.1988), where, as the court points out, we held that the well-pleaded complaint rule is not absolute and that an action may be removed to federal court where the real nature of the complaint is federal, not matter how the complaint is characterized. The plaintiff in that case filed a state claim against a police department that was following the dictates of a federal consent decree in its promotions. We held that the plaintiff's claim was in fact a collateral attack on the consent decree and because, just as here, the subject of the dispute was a creature of federal law, the claims had a sufficiently federal character to be removed. Id. at 245.
 
 
 86
 The court attempts to distinguish Striff by arguing that the plaintiffs here are not suing to enforce any federal standards; they simply want to enforce a separate state standard. All the permit means, according to the court, is that the project is in compliance with federal law. The validity of the permit and the challenge to the operation of the project are separate issues.
 
 
 87
 In fact, in this regard, this case and Striff are indistinguishable. In Striff, the consent decree did not order the police department to give or not give any promotions. Hence, Striff's request to block any promotions did not directly contradict any part of the consent decree. The decree merely specified as a matter of law, incorporating both the federal and state law governing this matter, the method by which promotions were to be given. In our case, as well, the court argues that there is no federal requirement that the project be built and that the MEPA suit does not interfere with the operation of the federal process.
 
 
 88
 In fact, though, the plaintiffs in this case, as in Striff, are challenging the validity of the federal process. The federal and state governments have decided that this permit process will govern the construction of projects and, as in Striff, any collateral challenge to the results of this process cannot be allowed. The true nature of the plaintiffs' complaint is evident from the Audubon plaintiffs' request that the court issue a permanent injunction restraining the city or anyone acting in concert with it "from constructing or causing the construction of the incinerator," as well as from the Ontario plaintiffs' request that the trial court determine the "validity, applicability, and reasonableness of the standards used for granting the permit." Clearly, the plaintiffs, like Striff, are unhappy with the results of the federal process and wish them overturned.
 
 
 89
 Therefore, our court, by considering the validity of the permit and the MEPA claims are separate issues, misapprehends the point of the comprehensive permitting process. A permit, issued under the Michigan SIP, means that the project has complied with both state and federal regulations and may be built. The court's argument would be more persuasive if the permit incorporated only federal standards, and a separate action attacking the standards used in granting the permit were pursued in state court. This would be the case, for example, if the state did not present an implementation plan and the EPA, pursuant to 42 U.S.C. Sec. 7410(c)(1), submitted its own plan for the state. Here, however, state law was considered and implemented in the granting of the permit. Thus, the Michigan SIP allows the state to implement its own pollution standards, but it does so in a way that preserves the essentials of the regulatory scheme.
 
 
 90
 This emphasis on the permit, however, does not mean that MEPA has no role to play in the regulation of pollution. It only means that it cannot be used as a vehicle for subverting the system of combined state and federal permitting established by the Clean Air Act. If the plant does not perform as advertised, its operation can be challenged either through a MEPA suit or in a federal action. If the operation of the plant as advertised proves to be unacceptable, that operation then can be complained of in state courts under MEPA. For example, if, after the plant is operating, the plaintiffs contend that the plant's emissions degrade the environment, they can file a suit under MEPA seeking to remedy the production of pollution. There is, though, neither precedent nor logic to support our requiring the defense of the permit itself in this completely untimely proceeding. The Michigan courts can exercise their independent power of review without emasculating the regulatory scheme set up by the Act.
 
 
 91
 The court cites two cases to show that state suits are generally not preempted by regulatory schemes similar to that of the Clean Air Act. In fact, these cases illustrate how such suits can be fit into a comprehensive state-federal system of regulation. In International Paper Co. v. Ouellette, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987), the Supreme Court held that the Clean Water Act, which contains exactly the same savings clause as the Clean Air Act, did not preempt a state court nuisance suit by individual landowners against a company whose mill was allegedly polluting the water, even where the alleged polluters had a permit under the Clean Water Act. A MEPA suit seeking to halt destructive emissions from the operating incinerator would be equivalent to the nuisance suit in Ouellette and would be allowed under my proposed disposition of this case. One must also note, when looking at Ouellette, the care taken by the Court in ensuring that the application of the state law did not "disrupt the regulatory partnership established by the permit system." Id. 107 S.Ct. at 815. The Court recognized that the allowance of a nuisance suit did not disrupt that partnership; the kind of suit the plaintiffs filed in this case does.
 
 
 92
 The second case the majority cites in support of its position makes the same point as Ouellette. The Seventh Circuit in People of State of Ill. v. Kerr-McGee Chem. Corp., 677 F.2d 571 (7th Cir.), cert. denied, 459 U.S. 1049, 103 S.Ct. 469, 74 L.Ed.2d 618 (1982), held that the plaintiffs could maintain a state court action against a company engaged in the handling of hazardous radioactive wastes even though the industry was subject to pervasive regulation by the Nuclear Regulatory Commission. The action in Kerr-McGee, like the one in Ouellette, was one to abate the nuisance from the allegedly ill-handled waste. This type of suit, again, is permissible under the approach I am suggesting. The state has every right under the Clean Air Act, as under these other regulatory schemes, to assess and correct the actual production of pollution.
 
 
 93
 Indeed, the Michigan Supreme Court has held that MEPA calls for precisely this type of adjudication. In Ray v. Mason County Drain Comm'r., 393 Mich. 294, 306-07, 224 N.W.2d 883, 888 (1975), in a passage quoted in the court's opinion, the Michigan Supreme Court stated: "The Act allows the courts to fashion standards in the context of actual problems as they arise in individual contexts." (emphasis added) This kind of action is very different from an untimely attack on the standards used by the responsible regulatory agencies in performing their complex and important tasks.
 
 
 94
 It is my conclusion, then, that the inconvenience and confusion that will result from the court's decision are unnecessary. By understanding MEPA as part of a system of regulation that we judges, within the limits of our power, have a responsibility to help make work, we can honor the intentions of the Michigan legislature in passing MEPA, as well as Congress's enactment of the savings clause in the Clean Air Act, and still preserve the viability of the regulatory scheme worked out by the federal and state legislatures. Disrupting that scheme does not serve the asserted ends of comity and federalism. Therefore, I dissent.
 
 
 
 [1]
 LAER is defined by the CAA to be the most stringent emission limitation contained in any SIP or the most stringent emission limitation achieved in practice for a class or category of service, whichever is more stringent. 42 U.S.C. Sec. 7501(3)
 
 
 [2]
 The MAPCC has assigned actual permitting responsibility to the MDNR. For the sake of simplicity, this opinion generally refers only to the MAPCC
 
 
 [3]
 This court has jurisdiction to consider the denial of the motions to remand because they are coupled with appeals from the final judgment. See Fakouri v. Pizza Hut of America, 824 F.2d 470, 472 (6th Cir.1987)
 
 
 [4]
 The defendants contend that a district court's finding that a complaint has been "artfully pleaded" to avoid federal jurisdiction must be upheld unless it is clearly erroneous, relying on the Ninth Circuit's holding in Salveson v. Western States BankCard Ass'n, 731 F.2d 1423, 1429 (9th Cir.1984). However, in a holding subsequent to Salveson the Ninth Circuit has rejected application of the clearly erroneous standard. Sullivan v. First Affiliated Securities, Inc., 813 F.2d 1368, 1371 (9th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 150, 98 L.Ed.2d 106 (1987). Even if the clearly erroneous standard is applied in this case, we are "left with the definite and firm conviction that a mistake has been committed." See United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), and Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)