RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0203p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

AMMEX, INC.,

　　　　　　　　　　　　　　*Plaintiff-Appellant*,

　　　*v.*

GORDON WENK, in his capacity as Director of the
Michigan Department of Agriculture & Rural
Development,

　　　　　　　　　　　　　　*Defendant-Appellee*.

> No. 18-1677

———————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:18-cv-10751—Laurie J. Michelson, District Judge.

Argued: February 1, 2019

Decided and Filed: August 21, 2019

Before: GRIFFIN, WHITE, and BUSH, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Robert M. Palumbos, DUANE MORRIS LLP, Philadelphia, Pennsylvania, for
Appellant. Elizabeth Morrisseau, OFFICE OF THE MICHIGAN ATTORNEY GENERAL,
Lansing, Michigan, for Appellee. **ON BRIEF:** Robert M. Palumbos, J. Manly Parks, Leah A.
Mintz, DUANE MORRIS LLP, Philadelphia, Pennsylvania, Amy E. McCracken, DUANE
MORRIS LLP, Chicago, Illinois, for Appellant. Elizabeth Morrisseau, Danielle Allison-Yokom,
OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

　　　WHITE, J., delivered the opinion of the court in which GRIFFIN, J., joined. BUSH, J.
(pp. 12–24), delivered a separate opinion concurring in the judgment.

_____

**OPINION**

_____

HELENE N. WHITE, Circuit Judge.  Plaintiff-Appellant Ammex, Inc. (Ammex) appeals the district court's denial of its motion seeking to preliminarily enjoin the Michigan Department of Agriculture and Rural Development (MDARD) from enforcing a gasoline-volatility standard on the basis that the standard violates the Supremacy Clause and dormant Foreign Commerce Clause of the United States Constitution.  Because we conclude that the MDARD's enforcement of the standard is enforcement of federal law, we affirm the district court's denial of Ammex's motion for preliminary injunction.

**I.  Background**

**A.  Ozone Air Quality Standards Under the Clean Air Act**

In 1970, Congress amended the Clean Air Act (CAA) to direct the Environmental Protection Agency (EPA) to establish National Ambient Air Quality Standards (NAAQS) for certain air pollutants.  *See* 42 U.S.C. § 7409.  "Although the [NAAQS] are set federally, the 'primary responsibility for assuring' they are met lies with the States." *Sierra Club v. Korleski*, 681 F.3d 342, 343 (6th Cir. 2012) (quoting 42 U.S.C. § 7407(a)).  The CAA thus directs each state to propose a state implementation plan (SIP) that "specif[ies] the manner in which national . . . ambient air quality standards will be achieved and maintained" in that state.  42 U.S.C. § 7407(a).  After providing "reasonable notice and public hearings," the state is required to submit the SIP to the EPA.  *Id.* § 7410(a)(1).  The EPA must then determine whether the proposed SIP meets certain minimum criteria, and, if so, approve the SIP.  *Id.* § 7410(k)(1)(B), (3).  The EPA must also "assemble and publish a comprehensive document for each State" listing the requirements of the SIP, and "publish notice in the Federal Register of the availability of such documents."  *Id.* § 7410(h)(1).  The CAA provides that the EPA and citizens can enforce violations of an EPA-approved SIP in federal court.  *See id.* §§ 7413(a), 7604.

In 1990, Congress again amended the CAA to, among other things, set a national Reid Vapor Pressure (RVP)[1] standard for gasoline. *See id.* § 7545(h). Congress required the EPA to "promulgate regulations making it unlawful for any person during the high ozone season (as defined by the Administrator) to sell, offer for sale, dispense, supply, offer for supply, transport, or introduce into commerce gasoline with a Reid Vapor Pressure in excess of 9.0 pounds per square inch (psi)." *Id.* § 7545(h)(1). Congress prohibited states from setting a different RVP standard, *see id.* § 7545(c)(4)(A)(ii), unless the EPA finds the deviation "necessary" to achieve a NAAQS and approves the modified standard in the state's SIP. *See id.* § 7545(c)(4)(C)(i); 71 Fed. Reg. at 46880 (explaining that "a State may prescribe and enforce a[] . . . low-RVP requirement only if the EPA approves the control into the State's SIP" and the EPA "find[s] that the state control is necessary to achieve a NAAQS"); *see also* 42 U.S.C. § 7545(h)(1) (enabling the EPA to "establish more stringent Reid Vapor Pressure standards in a nonattainment area as the [EPA] finds necessary").

**B. Michigan's Efforts to Meet Ozone Air Quality Standards**

Michigan has had an EPA-approved SIP since 1972. 37 Fed. Reg. 10,842, 10,873 (May 31, 1972). In 2004, the EPA informed Michigan that eight counties in southeast Michigan, including Wayne County, were "nonattainment" areas for the ozone NAAQS. 71 Fed. Reg. at 46880. In response, Michigan enacted House Bill 5508, which amended Mich. Comp. Laws § 290.650d (hereinafter the "Summer Fuel Law") to limit the RVP for gasoline sold during the summer months within those eight counties. The Summer Fuel Law provides that gasoline stations in those counties must sell gasoline with a vapor pressure that does not exceed 7.0 psi during the summer months: "Beginning June 1 through September 15 of 2007 and for that period of time each subsequent year, the vapor pressure standard shall be 7.0 psi for dispensing facilities in Wayne" and seven other counties in southeast Michigan. Mich. Comp. Laws § 290.650d.

---

[1]RVP "is a measure of a gasoline's volatility at a certain temperature and is a measurement of the rate at which gasoline evaporates and emits [volatile organic compounds]." Approval and Promulgation of Air Quality Implementation Plans; Michigan; Control of Gasoline Volatility, 71 Fed. Reg. 46879, 46880–81 (Aug. 15, 2006). "Lowering RVP in the summer months can offset the effect of high summer temperatures upon the volatility of gasoline, which, in turn, lowers emissions of [volatile organic compounds]" that contribute to the production of ground level ozone. *Id.* at 46881.

The term "dispensing facility" is defined as "a site used for gasoline refueling." *Id.* § 290.642(m). The MDARD is responsible for enforcing the RVP standard. *Id.* § 290.647.

Michigan thereafter sought the EPA's approval to revise its SIP to incorporate House Bill 5508. 71 Fed. Reg. at 46879. After concluding that the revised RVP standards were "necessary" for attainment of the applicable ozone NAAQS, the EPA approved the incorporation of House Bill 5508 into Michigan's SIP. Approval and Promulgation of Air Quality Implementation Plans; Michigan; Control of Gasoline Volatility, 72 Fed. Reg. 4432, 4434–35 (Jan. 31, 2007). The EPA has since "incorporat[ed] by reference" House Bill 5508 into the federal regulation setting forth Michigan's SIP. 40 C.F.R. § 52.1170.

### C.  Michigan's Enforcement Against Ammex

Ammex operates a duty-free store near the Ambassador Bridge, which connects Detroit, Michigan, to Windsor, Canada. Ammex's facility is located in Wayne County, Michigan, beyond the exit point established by United States Customs and Border Protection, i.e., the point at which a person approaching the United States' border with Canada has "no practical alternative" but to exit the United States. 19 C.F.R. § 19.35(d). Ammex sells a variety of goods, including duty-free gasoline. Ammex began selling gasoline in the late 1990s, and sells about 400,000 gallons each month. Ammex has historically purchased gasoline from a supplier in a free-trade zone in Toledo, Ohio.

In the summer of 2012, the MDARD tested Ammex's gasoline and found that it had an RVP that exceeded the Summer Fuel Law's 7.0 psi requirement. The MDARD issued a stop-sale order preventing Ammex from selling the non-compliant gasoline. The MDARD filed an action against Ammex in state court, and the parties eventually reached a settlement that (1) required Ammex to sell gasoline that complied with the 7.0 RVP standard between June 1 and September 15 of each year and (2) provided that the state court retained jurisdiction to enforce the settlement agreement for three years. Ammex sold gasoline that complied with the Summer Fuel Law during the summers of 2013, 2014, 2015, 2016, and 2017.

**D. Ammex's Suit**

In the months leading up to the summer of 2018, Ammex believed that it would be unable to secure gasoline that complied with both federal-customs regulations regarding duty-free sales[2] and the Summer Fuel Law. Ammex was unable to purchase gasoline meeting the 7.0 psi requirement because one of the tanks that Ammex leased from a tank farm to hold the bonded gasoline was undergoing repairs and maintenance. Ammex's attempts to find another supplier of gasoline that met both the duty-free and gasoline-volatility requirements were unsuccessful.

As a result, Ammex filed this action for a declaratory judgment against Gordon Wenk (Wenk), in his official capacity as Director of the MDARD. The complaint asserts that Wenk's enforcement of the Summer Fuel Law against Ammex is unconstitutional under the dormant Foreign Commerce Clause and that the Summer Fuel Law, as applied to Ammex, is preempted by federal-customs law.

Ammex filed a motion for a preliminary injunction, asking that the district court enjoin Wenk from enforcing the Summer Fuel Law against it during the pendency of the litigation. The district court denied the motion for preliminary injunction.

The district court first considered Wenk's argument that House Bill 5508, or at least the Summer Fuel Law, is federal law, and therefore did not violate the dormant Foreign Commerce Clause[3] or the Supremacy Clause.[4] The district court noted that Wenk appeared to be correct, observing that the EPA approved the Summer Fuel Law and incorporated it into the Code of

---

[2]Federal laws and customs regulations require that Ammex purchase gasoline from a foreign source (or from a U.S. supplier in a Foreign Trade Zone) or pay a duty.

[3]The Commerce Clause grants Congress the exclusive authority to "regulate Commerce with foreign Nations, and among the several states." U.S. Const. art. I, § 8, cl. 3. "[T]he [Commerce] Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate and foreign] commerce." *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984). This self-executing aspect of the Commerce Clause is known as the "dormant" or "negative" Commerce Clause. *See Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 310 n.9 (1994).

[4]"[T]he Supremacy Clause invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)) (citation omitted).

Federal Regulations; the EPA could enforce the law; and the EPA prompted the revised standard and found it necessary to meet the ozone NAAQS.

The district court opted not to decide the issue, however, and instead proceeded to analyze whether, if the Summer Fuel Law is state law, it violates either the Supremacy Clause or the dormant Foreign Commerce Clause. The district court concluded that the Summer Fuel Law does not violate either clause, and therefore Ammex had not shown a likelihood of success on the merits to warrant a preliminary injunction.

## II. Discussion

"A district court must balance four factors when considering a motion for a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012).

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). "Whether the movant is likely to succeed on the merits is a question of law we review de novo." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam). "We review for abuse of discretion, however, the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief." *Id.* (internal quotation marks omitted). "This standard is deferential, but the court may reverse the district court if it improperly applied the governing law, used an erroneous legal standard, or relied upon clearly erroneous findings of fact." *Id.*

The threshold issue is whether the Summer Fuel Law is fairly characterized as federal law. We conclude that it is, and therefore the MDARD's enforcement of the law against Ammex does not violate the dormant Foreign Commerce Clause or the Supremacy Clause.

The Summer Fuel Law has several characteristics indicative of a federal law. First, the history of the law suggests it is federal law. The EPA designated certain counties as non-attainment areas, forcing Michigan to respond by adjusting the RVP standard. After Michigan developed the new standard and submitted it to the EPA, the EPA approved the more stringent RVP standard and incorporated it into the Code of Federal Regulations.

The scheme for enforcing the law likewise suggests that the law is federal. Although the CAA places primary enforcement responsibility with the states, it vests ultimate enforcement power in the EPA. The EPA may enforce the law against non-compliant retailers: if the EPA determines that a retailer is not complying with the Summer Fuel Law, the EPA can order the retailer to comply, issue an administrative penalty order, or commence an action against the retailer in court to enforce the requirement. 42 U.S.C. § 7413(a)(1). In addition to its direct enforcement powers, the EPA also holds the power to sanction Michigan for failing to enforce the SIP. *Id.* § 7509(a).

Additionally, the EPA has the ultimate authority over any changes to the Summer Fuel Law. Because the RVP standard is part of Michigan's SIP, Michigan cannot amend the standard without EPA approval. The CAA prohibits states from "adopt[ing] or enforc[ing] any emission standard or limitation which is less stringent" than that contained in its SIP. *Id.* § 7416. Michigan also cannot adopt a more stringent standard than its SIP without the EPA approving it. *See id.* § 7545(c)(4)(A)(ii), (C)(i). Thus, the EPA has the ultimate authority over RVP standards.

Further, the scheme for regulating RVP in gasoline strongly supports that the MDARD's enforcement of the Summer Fuel Law is enforcement of federal law. In the 1990 Amendments to the CAA, Congress set a national RVP standard that generally preempted states from setting a different RVP standard.[5] The CAA provides that a state can adopt and enforce a more stringent

---

[5]It is notable that at the time Congress considered the 1990 Amendments to the CAA, "[i]n contrast to federally encouraged state control over stationary sources, regulation of motor vehicle emissions had been a principally federal project." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079 (D.C. Cir. 1996); *see also Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1175 (9th Cir. 2015) ("[T]he CAA makes the regulation of mobile source emissions . . . a federal responsibility, [and] Congress has expressly preempted states from setting emissions standards for mobile sources." (internal quotation marks omitted)). The reasons for this disparate treatment are both historical and practical. In contrast to the motor-vehicles emissions, Congress was legislating in 1990 against "a history of detailed state regulation of stationary sources." *Engine Mfrs. Ass'n*, 88 F.3d at 1079. Practically, it is "difficult[]" to "subject[] motor vehicles, which readily move across state boundaries, to control by individual

RVP standard only if the EPA finds it "necessary" to meet the applicable NAAQS and approves it in a SIP.  There are two practical effects of this scheme.  First, Michigan's Summer Fuel Law had no legal effect until the EPA approved it:  if Michigan had passed and then attempted to enforce the Summer Fuel Law without EPA approval, the law would likely have been preempted.  Second, the EPA could not approve the Summer Fuel Law without first finding that it was necessary to meet the ozone NAAQS.  Although the CAA generally empowers the EPA to set national standards and allows states to figure out how to meet them, that is not the case here.

Instead, the EPA itself found the Summer Fuel Law necessary to meet the ozone NAAQS.  In reaching that conclusion, the EPA recognized that Michigan had no practical measures to meet the NAAQS other than by lowering the RVP.  71 Fed. Reg. at 46882 ("EPA is basing today's action on the information available to us at this time, which indicates that adequate reasonable and practicable non-fuel measures that would achieve these needed emission reductions, and protect Michigan's air quality in a timely manner are not available to the State.").  Thus, when the EPA designated the Michigan counties non-attainment zones, Michigan had only one practical option to meet the EPA standards—reduce the RVP for gasoline sold in the non-attainment counties—and Michigan needed the EPA's approval in order to implement that option.

The result of the scheme described above is that: (1) the EPA required Michigan to lower its ozone levels, (2) the only practical and feasible means of doing so was to enact a more stringent RVP standard, (3) that standard could only be enacted if the EPA found it necessary and approved it, (4) once the EPA approved it, Michigan could not change that standard again without EPA approval, and (5) if Michigan fails to adequately enforce the standard, the EPA can seek sanctions against it.[6]  Under these circumstances, we conclude that the Summer Fuel Law is federal law.

---

states." *Id.*  Congress additionally feared "the possibility of 50 different state regulatory regimes [which] 'raised the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers.'"  *Id.* (quoting *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979)).

[6]Ammex does not claim in its complaint that the duty-free gasoline it sells is not within the intended scope of the Summer Fuel Law, and that statutory-interpretation question is not before us in this appeal.

We also find support in the way courts have consistently treated SIPs. Although there is no case addressing this question in this somewhat unusual context, federal courts in other contexts have recognized the federal character of a state law incorporated into a SIP. This court has stated on occasion in dicta that once a SIP is approved, it becomes federal law. *See Sierra Club*, 681 F.3d at 343 ("[I]f the EPA approves a State's proposal, then the SIP is added to the Code of Federal Regulations and becomes federal law."); *Her Majesty the Queen In Right of the Province of Ontario v. City of Detroit*, 874 F.2d 332, 335 (6th Cir. 1989) ("If a [SIP] is approved by the EPA, its requirements become federal law . . . ."). Other circuits have also stated that after it is approved, a SIP is federal law. *See, e.g.*, *Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 120 (3d Cir. 2016) ("Once the EPA approves the SIP, it becomes binding federal law."); *California Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 505 n.6 (9th Cir. 2015) (noting that its precedent "consistently recognized that an approved SIP is federal law"); *Indiana v. EPA*, 796 F.3d 803, 806 (7th Cir. 2015) ("Once it is approved by EPA, a state rule embodied in a SIP becomes enforceable federal law."); *US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1159 (10th Cir. 2012) ("Approved SIPs are enforceable as federal law. . . ."); *see also Ass'n of Am. R.Rs. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1098 (9th Cir. 2010) (holding that state rules that had not yet been approved by the EPA were not federal law and therefore were preempted).

Ammex's arguments otherwise are unavailing. Both Ammex and the concurrence propose that House Bill 5508 (containing the Michigan Summer Fuel Law) and the EPA's incorporation of that bill by reference in the Code of Federal Regulations are at most parallel provisions. According to Ammex and the concurrence, the state law remains state law and the SIP contains an identical federal law. Ammex argues that it is merely seeking to enjoin the MDARD from enforcing the Michigan statute setting out the RVP, and its challenge therefore cannot implicate federal law.

This argument fails for a number of reasons. As an initial matter, the Michigan statute and the federal regulation are not independent of each other. The two are interconnected because the EPA regulation incorporates by reference the state bill containing the statute setting the summer RVP standard, and the interpretation of one necessarily affects the interpretation of the other. Treating them as parallel provisions could create the irrational result of interpreting the same statute differently depending on the context of the challenge. Moreover, the interconnectedness of the state statute and federal regulation is reinforced by the CAA's

enforcement scheme, allowing for enforcement of the same standard by both the EPA and the state and providing the state with the primary enforcement responsibility. Barring the MDARD's enforcement of the Summer Fuel Law against Ammex necessarily impacts the enforcement regime created by the CAA.[7] In light of the regulatory and enforcement scheme underlying the RVP standard, we cannot accept Ammex's argument that it merely seeks to bar the MDARD's enforcement of the state law and that the state law and federal regulation are at most parallel provisions.[8]

Finally, Ammex argues that the EPA has itself indicated that the Summer Fuel Law is only state law. Ammex relies on a scattering of EPA statements that could be read to support its position. However, Wenk identifies other statements from the EPA that suggest the opposite. Given that the EPA has not directly addressed this issue, the potentially conflicting statements from the EPA identified by both parties are of little value here.

In sum, the MDARD's enforcement of the Summer Fuel Law is enforcement of federal law,[9] and therefore Ammex did not have a likelihood of success on the merits of its claims that the MDARD's enforcement of the law violates the dormant Foreign Commerce Clause or the

---

[7]This is not meant to suggest that Ammex is seeking to effectively nullify or invalidate any EPA action, a circumstance that could call into question our jurisdiction. *See United States v. Ford Motor Co.*, 814 F.2d 1099, 1103 (6th Cir. 1987) ("[I]nvalidation of an EPA-approved SIP may only occur in the federal appellate courts on direct appeal from the Administrator's decision under [42 U.S.C.] § 7607(b)(1).").

[8]Contrary to the concurrence's suggestion, our holding does not mean that the Summer Fuel Law loses its status as state law. The only question we answer is whether the Summer Fuel Law is federal law.

[9]The concurrence claims that our holding creates a constitutional question whether Congress has impermissibly delegated executive power to state officials. Neither the parties nor the district court raised or addressed that issue, and we see no reason to address or decide it here. We note only that although the concurrence claims that treating the Summer Fuel Law as state law alone avoids the constitutional questions it raises, the sole authority the concurrence cites for that proposition actually rejects that suggestion. *See* Ronald J. Krotoszynski, Jr., *Cooperative Federalism, the New Formalism, and the Separation of Powers Revisited:* Free Enterprise Fund *and the Problem of Presidential Oversight of State-Government Officers Enforcing Federal Law*, 61 Duke L.J. 1599, 1659–63 (2012) (rejecting the position that "states participating in cooperative-federalism programs are merely enforcing state law" as "a colorable argument" and concluding that the "better argument" is that "when states act as agents of the federal government, they are administering federal law").

Supremacy Clause.[10]   Therefore, the district court properly denied Ammex's request for a preliminary injunction. *See Obama for Am.*, 697 F.3d at 436.

### III.  Conclusion

For the reasons stated above, we AFFIRM the district court's denial of Ammex's motion for preliminary injunction.

---

[10]Because we conclude the Summer Fuel Law is federal law, we do not address whether, if the Summer Fuel Law were only state law, the MDARD's enforcement of it against Ammex would violate the dormant Foreign Commerce Clause or the Supremacy Clause.

---

**CONCURRING IN THE JUDGMENT**

---

JOHN K. BUSH, Circuit Judge, concurring in the judgment. Although the Majority Opinion correctly concludes that Michigan's Summer Fuel Law, Michigan Compiled Law § 290.650d, is constitutional, I question its reasoning that this state statute has been transformed into federal law that the Michigan Department of Agriculture & Rural Development ("MDARD") now is charged to enforce. *See* Majority Op. at 10. This rationale raises more constitutional problems than it resolves. If Michigan's Summer Fuel Law is now federal law that state officials must enforce, then the Majority would seem to tacitly hold that the Federal Government may delegate Article II authority to the States to enforce federal law in cooperative-federalism programs—a proposition that is highly debatable given Supreme Court precedent. A safer ground on which to rest our decision is to conclude that once state law, Michigan's Summer Fuel Law remains state law for purposes of enforcement by state officials. For reasons discussed below, this state law neither offends the dormant foreign commerce clause nor is preempted by federal law. I therefore concur in the judgment only.

**I.**

"The federal Clean Air Act is a model of cooperative federalism." *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 467 (6th Cir. 2004). As the Majority explains, Congress set a national Reid Vapor Pressure ("RVP") standard and prohibited States from setting a different standard unless EPA determines that the deviation was "'necessary' to achieve a [National Ambient Air Quality Standards ("NAAQS")] and approves the modified standard" in the State's state implementation plan ("SIP"). Majority Op. at 3 (citations omitted). If EPA approves a State's SIP, then EPA requires the State to enforce the SIP and may sanction the State for failing to do so. 42 U.S.C. § 7509(a). Although the Majority elegantly disposes of Ammex's constitutional challenges by holding that the MDARD now is enforcing "federal law" when it enforces Michigan's SIP, *see* Majority Op. at 10, this conclusion warrants a closer inspection because it implicates larger constitutional concerns in the context of cooperative-federalism programs established by Congress. *See, e.g.*, Ronald J. Krotoszynski, Jr., *Cooperative Federalism, the New Formalism,*

*and the Separation of Powers Revisited:* Free Enterprise Fund *and the Problem of Presidential Oversight of State-Government Officers Enforcing Federal Law*, 61 Duke L.J. 1599, 1659–69 (2012).

Article II, of course, vests the President of the United States with "[t]he executive Power," U.S. Const. art. II, § 1, and provides that the President "shall take Care that the Laws be faithfully executed," *id.* § 3. *See also Myers v. United States*, 272 U.S. 52, 164 (1926). As the Supreme Court explained, "the Presidency concentrates executive authority 'in a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations. In drama, magnitude and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear.'" *Clinton v. Jones*, 520 U.S. 681, 698 (1997) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring)). In recognition that the execution of federal law is vested with the President and those people under her or his control, the Supreme Court has invalidated attempts by Congress to delegate the executive power to non-Article II actors. *See e.g.*, *Printz v. United States*, 521 U.S. 898, 922 (1997) (holding provisions of Brady Act unconstitutional for transferring enforcement of federal law to "thousands . . . in the 50 States," who "are left to implement the program without meaningful Presidential control"); *Bowsher v. Synar*, 478 U.S. 714, 726 (1986) (holding that Congress cannot reserve unto itself "control over the execution of the laws" because "[t]he structure of the Constitution does not permit Congress to execute the laws").

The Court also has stressed that the President's removal authority over agents who wield federal executive power cannot be unduly restricted, *see Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 496–97 (2010), for without the appropriate removal authority, the President "can neither ensure that the laws are faithfully executed, nor be held responsible for" an executive agent's actions, as "the President 'cannot delegate ultimate responsibility or the active obligation to supervise that goes with it.'" *Id.* at 496 (quoting *Clinton*, 520 U.S. at 713 (Breyer, J., concurring in the judgment)). Further still, the Court has been mindful that Congress cannot confer Article III standing upon a party who is not authorized to wield federal executive power for the purpose of "[v]indicating the *public* interest" and carrying out the enforcement of federal law. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 576

(1992) ("To permit Congress to convert the undifferentiated public interest in executive officers' compliance with the law into an 'individual right' vindicable in the court is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, § 3)).

Members of the Supreme Court have noted that substantial constitutional issues arise from certain arguable delegations of federal executive power to non-Article II actors. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring) ("Difficult and fundamental questions are raised when we ask whether exactions of public fines by private litigants, and the delegation of Executive power which might be inferable from the authorization, are permissible in view of the responsibilities committed to the Executive by Article II of the Constitution of the United States."); *see also id.* at 209–10 (Scalia, J., dissenting) (observing the same). Not only have several justices highlighted constitutional concerns posed by certain arguable delegations of federal executive power to private parties, but a majority of justices have, in the context of *qui tam* suits, explicitly reserved judgment on the issue until the appropriate time. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 778 n.8 (2000) ("[W]e express no view on the question whether *qui tam* suits violate Article II, in particular the Appointments Clause of § 2 and the 'take Care' Clause of § 3."). It would seem that the difficult and fundamental questions involving delegation of Article II power to private parties are only augmented by federalism concerns in a case where state actors have been arguably delegated federal law enforcement authority in cooperative-federalism programs. *See Printz*, 521 U.S. at 922.

It is therefore problematic to rest our decision, when it is not necessary, on reasoning that would seem to allow Congress to delegate Article II power to state officials.[1] Under the

---

[1]The Majority is correct that the parties did not argue and the district court did not address the constitutional ramifications described above. But the district court did "ultimately decline[] to find that [the Summer Fuel Law] is a federal regulation," R. 34, PageID 906, for good reasons. To support its decision to avoid calling the state statute as enforced by state officials a federal law, the district court observed that EPA referred to the Summer Fuel Law as a "state law" in the regulation. The district court also observed that our court's dicta in *Sierra Club v. Korleski*, 681 F.3d 342 (6th Cir. 2012) and *Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit*, 874 F.2d 332 (6th Cir. 1989), suggesting that "state law 'becomes' federal law[,] may have been imprecisely worded." *Id.* at PageID 907. And the district court recognized that treating the Summer Fuel Law as state law would allow the district court to avoid having to resolve Ammex's separate challenge to the Summer Fuel

Majority's approach, Michigan is charged with the enforcement of federal emissions standards for gasoline under federal law. Although Michigan's enforcement would be limited to its territorial boundaries, it nonetheless arguably exercises federal executive power when it enforces the SIP if this statute is deemed to be federal law to be enforced by state officials. Under such an arrangement that views the SIP as federal law, the President would not have the power of removal of any of the state officials charged with such federal-law enforcement. It is also arguable that the President would not have sufficient control over how the policy of this "federal" law is enforced. Although EPA has the statutory authority to sanction a State for *failing* to enforce its SIP, EPA appears to have no power to direct a State in how to carry out the enforcement of its SIP once the enforcement proceedings have commenced. In other words, this statutory scheme, as understood by the Majority, would arguably constitute an impermissible interference with the President's Article II powers and duties.

Thus, to avoid these constitutional concerns altogether, the better course is not to hold that the Michigan's Summer Fuel Law as enforced by MDARD "is federal law."[2] Instead, when EPA "incorporate[ed] by reference," 40 C.F.R. § 52.1170 (2019), Michigan's Summer Fuel law, that federal agency at most adopted a parallel federal regulation and thereby incorporated the requirements of the SIP into federal law. Michigan officials' enforcement of SIP itself, however, remains the enforcement of state law, though it is identical to a federal provision. We would thereby avoid all looming Article II and federalism concerns arising from the state law to being deemed transformed into federal law that MDARD must enforce. *See generally* Krotoszynski,

---

Law, which would arise only if the state law were deemed to be "federal" law. As to the latter point, if the Summer Fuel Law as enforced by MDARD is deemed to be federal law, the district court may need to address Ammex's argument that the SIP does not apply to the gas it exports because the EPA has expressly disclaimed that fuel subject to regulation under the Clean Air Act is limited to "fuel that is 'introduced into commerce,' not at fuel for export." R. 33, PageID 884 (footnote omitted). Also, the Majority does not adequately explain why it deems the SIP to be federal law for purposes of state enforcement even though the very federal regulation approving the SIP refers to it as state law. *See* 72 Fed. Reg. 4432, 4434 (Jan. 31, 2007) ("This Action merely approves *state law* as meeting Federal requirements and imposes no additional requirements beyond those imposed by state law." (emphasis added)).

[2]To be sure, this conclusion does not imply that the federal government is prohibited from adopting a State's policy as federal law by copying identical provisions of the state law. The analytical problem here is to suggest that state law can be transformed into a federal law subject to enforcement by state officials.

Jr., *supra*, at 1659 ("[T]he entire problem could be avoided if the Supreme Court were to hold that when states participate in cooperative-federalism programs, they enforce only state law.").[3]

This conclusion also is consistent with this court's prior statement that "[i]f a [SIP] is approved by the EPA, its requirements become federal law." *Her Majesty the Queen in Right of the Province of Ont. v. City of Detroit*, 874 F.2d 332, 335 (6th Cir. 1989); *see also Sierra Club v. Korleski*, 681 F.3d 342, 343 (6th Cir. 2012) ("[I]f the EPA approves a State's proposal, then the SIP is added to the Code of Federal Regulations and becomes federal law."). Before today our court has never suggested that a state official may be required to enforce federal law if a state law is adopted by EPA. Instead, our reasoning acknowledged that, once adopted by EPA, the *requirements* of the State's SIP become part of federal law but the SIP itself still remains part of the state law that state officials enforce. Indeed, it would be a novel principle in our nation's jurisprudence if a state enforcement agency charged by state law to enforce state law can, by edict of a federal agency, also be deputized an agent of federal law enforcement simply because that agency adopts text in a federal regulation identical to the wording of a state law.

The Majority concludes that treating the Summer Fuel Law and the Regulation "as parallel provisions could create the irrational result of interpreting the same statute differently depending on the context of the challenge." Majority Op. at 9. But there is nothing irrational about shifting the analysis depending on the sovereign's law that is under review for purposes of the law's constitutionality. Making the constitutional analysis dependent upon the sovereign involved is the natural by-product of our dual-sovereign system, *see, e.g.*, *Arizona v. United States*, 567 U.S. 387, 395–96, 400–02 (2012)—a method of governance lauded for its protection of individual rights, *see Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475–77 (2018). *See also Gamble v. United States*, 139 S. Ct. 1960, 1968 (2019); *New York v. United*

---

[3]*See also* Krotoszynski, Jr., *supra*, at 1669 ("Article II's Vesting and Take Care Clauses create an imperative for meaningful presidential oversight over the implementation of federal law, yet whether cooperative-federalism structures provide sufficient presidential oversight to overcome potential separation-of-powers objections very much remains an open question. If *Free Enterprise Fund* means what it expressly says, however, cooperative-federalism programs violate the separation-of-powers doctrine by unconstitutionally exporting the execution of federal law to state-government officers."). Although the Majority is correct that Krotoszynski argues that when "states act as agents of the federal government, they are administering federal law," Majority Op. at 10 n.9 (quoting Krotoszynski, Jr., *supra*, at 1663), Krotoszynski also acknowledges that the reasoning of the Supreme Court in *Free Enterprise Fund* could be read to call into question the constitutionality of that scenario (i.e., state officials acting as agents of the federal government in administering federal law). *See* Krotoszynski, Jr., *supra*, at 1669.

*States*, 505 U.S. 144, 181 (1992) ("[T]he Constitution divides authority between federal and state governments for the protection of individuals.").

Moreover, the Summer Fuel Law does not lose its character as a state law or otherwise transform into federal law because the parallel provisions could be interpreted differently. Should the Michigan courts interpret the state law differently than the federal law is interpreted, the federal law's interpretation presumably would have a preemptive effect if compliance with the state law would be in conflict with the requirements of federal law. *See State Farm Bank v. Reardon*, 539 F.3d 336, 342 (6th Cir. 2008). Parallel enforcement of state and federal law occurs frequently "because the powers of the Federal Government and the States often overlap," and "allowing both to regulate often results in two layers of regulation." *Gamble*, 139 S. Ct. at 1968–69. And yet despite this frequent occurrence, at no time are state actors deemed to be transformed into enforcers of federal law. Instead state officials enforce the law they were elected or appointed by their State to enforce—state law.

I also believe the Majority's concerns that treating state and federal law as parallel provisions would "nessarily impact[] the enforcement regime created by the CAA" are overblown. Majority Op. at 10. EPA, acting through its Administrator, of course may sue a regulated entity to enforce the SIP. 42 U.S.C. § 7413(a)(1). Thus, there is no reason to be concerned that Michigan's Summer Fuel Law, as state law, would necessarily impact of the federal law.[4]

In sum, Michigan's Summer Fuel Law, as enforced by MDARD, is and has always been a state law. Therefore, I do not believe we may dismiss the constitutional challenges to the statute with the Majority's broad brush stroke of declaring that state officials now are enforcing

---

[4]Moreover, if the Majority concludes that the SIP's enforcement would be necessarily impacted by this challenge, then consistent with *California Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 507, 513 (9th Cir. 2015), there would be a colorable argument that this court should dismiss the action for lack of subject-matter jurisdiction, as did the Ninth Circuit in *California Dump Truck Owners Ass'n*. Applying the Ninth Circuit's reasoning in *California Dump Truck Owners Ass'n*, 784 F.3d at 507–10, the *effect* of Ammex's "suit is to challenge both the EPA and the SIP" and in doing so, Ammex's suit impermissibly circumvents the requirements of the CAA that "invalidation of an EPA-approved SIP may only occur in the federal appellate courts on direct appeal from the Administrator's decision," *United States v. Ford Motor Co.*, 814 F.2d 1099, 1103 (6th Cir. 1987). *See also* 42 U.S.C. § 7607(b)(1). However, if Ammex's challenge is limited to Wenk's enforcement of the Summer Fuel Law as a state law, then there is no argument that we lack jurisdiction to reach the merits of Ammex's challenge.

federal law. Instead, we must paint with pointillism the reasons why the statute as part of state law neither violates the dormant foreign commerce clause nor is preempted by federal law. This task I undertake below.

## II.

A. Dormant Foreign Commerce Clause

One of the well-known and often-used enumerated powers of Congress is its power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. As interpreted by the Supreme Court, "the [Commerce] Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate and foreign] commerce." *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984). "In 'the unique context of foreign commerce,' a State's power is further constrained because of 'the special need for uniformity.'" *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 311 (1994) (quoting *Wardair Can., Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 8 (1986)). Indeed, the Court has stressed that in matters of foreign affairs and foreign trade, it is important that "the people of the United States act through a single government with unified and adequate national power." *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979) (quotation omitted). In other words, it is paramount that the federal government speak with "one voice" in its regulations of foreign commerce and in its relations with foreign governments. *Id.* at 449.

Should a state action prevent the federal government from speaking with one voice in matters of foreign commerce, that action offends the dormant foreign commerce clause. *Id.* at 453–54. However, where Congress acquiesces to the state action, the dormant foreign commerce clause is no longer offended. *See Barclays Bank PLC*, 512 U.S. at 323. In describing the level of acquiescence that is required, the Court held: "Congress may more passively indicate that certain state practices do *not* 'impair federal uniformity in an area where federal uniformity is essential'; it need not convey its intent with the unmistakable clarity required to permit state regulation that discriminates against interstate commerce . . . ." *Id.* (quoting *Japan Line*,

441 U.S. at 448) (citations omitted).**5**   Congress met this standard for acquiescence to the Michigan law for at least two reasons.

First, when Congress passed the CAA, it did so with the knowledge that even though "the [NAAQS] are set federally, the 'primary responsibility for assuring' they are met lies with the States." *Sierra Club*, 681 F.3d at 343 (quoting 42 U.S.C. § 7407(a)).   Thus, from the outset, Congress expressly knew that States would have a hand in the enforcement of the national standards.   Congress also contemplated that the States would, in certain circumstances, be allowed to regulate emissions in a manner different from its RVP express statutory limits when Congress authorized EPA to review any SIPs from the States requesting deviations from the national RVP standard that were "necessary" to achieve the applicable NAAQS standards in that State.   42 U.S.C. § 7545(h)(1).

Second, Congress has been aware of Michigan's Summer Fuel Law since 2007, when EPA noted in the Federal Register that "EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to the publication of the rule in the Federal Register."   72 Fed. Reg. 4432, 4435 (Jan. 31, 2007) (to be codified at 40 C.F.R. pt. 52).

Given its statutory scheme allowing States to deviate from the national RVP standard after EPA approval and its knowledge of Michigan's Summer Fuel Law, Congress has passively indicated that this statute does not impair an area of law where federal uniformity is essential to matters of foreign affairs and commerce.   *Cf. Barclays Bank PLC*, 512 U.S. at 324–26.   Thus, Michigan's Summer Fuel Law does not violate the one-voice doctrine.

Nor does the law fall into another category of state action that the Supreme Court has recognized violates the dormant commerce clause—namely, actions that regulate extraterritorial commerce.   *See Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 373 (6th Cir. 2013) (quoting *Int'l*

---

**5**By contrast, under a dormant commerce clause analysis, "state statutes [are exempt] from the implied limitations of the [c]lause only when the congressional direction to do so has been 'unmistakably clear.'" *Maine v. Taylor*, 477 U.S. 131, 139 (1986) (holding there was "no unambiguous statement of any congressional intent whatsoever 'to alter the limits of state power otherwise imposed by the Commerce Clause,'" to cure constitutional defect of a state statute (quoting *United States v. Pub. Utils. Comm'n of Cal.*, 345 U.S. 295, 304 (1953)).

*Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 645 (6th Cir. 2010)).  The extraterritoriality doctrine, though a "relic of the old world with no useful role to play in the new," *id.* at 378 (Sutton, J., concurring), prohibits States from "directly control[ling] commerce occurring wholly outside the boundaries of a State" and thereby "exceed[ing] the inherent limits of the enacting State's authority," *Healy v. Beer Institute*, 491 U.S. 324, 336 (1989).  To determine whether a statute is extraterritorial, the Court has held that the relevant inquiry is whether the "practical effect of the regulation is to control conduct beyond the boundaries of the State."  *Healy*, 491 U.S. at 336.

Ammex contends that Michigan is regulating beyond its borders because "as a matter of U.S. customs law, the goods sold at the Ammex facility, including gasoline, never enter the stream of domestic commerce."  Appellant Br. at 26.  As the district court recognized, it might be technically true that "the gasoline Ammex purchases from a foreign country or foreign trade zone, is stored beyond [U.S. Customs and Border Protection's] 'exit point' from the United States, and is taken to Canada immediately after purchase."  R. 34, PageID 921.  Nonetheless, Ammex remains geographically situated in Michigan, where all the sales to consumers occur, and as a result, Michigan is regulating conduct within its borders.  Furthermore, Michigan's Summer Fuel Law does not prevent Canada or any of Michigan's sister States from setting RVP standards of their own.  Thus, it cannot be said that the practical effect of Michigan's law is to control conduct beyond its own boundaries, and by extension this leads to the conclusion that the statute does not violate the extraterritoriality doctrine (assuming the doctrine remains relevant today).

Ammex also argues that Michigan's Summer Fuel Law is unconstitutional under the "traditional" dormant commerce clause analysis because the dormant foreign commerce clause analysis is the same.  In support, Ammex relies on *Antilles Cement Corp. v. Acevado Vilá*, 408 F.3d 41, 46 (1st Cir. 2005).  But this proposition is dubious for at least two reasons.

First, the statements Ammex relies upon from *Antilles* are dicta.  The First Circuit did not expressly hold that the analysis of the two doctrines was "essentially the same."  The *Antilles* court made this conclusion in an effort to determine whether the case presented a novel issue of constitutional law that should be avoided—namely, whether the market participant exception to the dormant commerce clause analysis applied to the foreign dormant commerce clause.  *See id.*

at 46–48. Concluding that there was a novel and complex issue of constitutional law at hand, the First Circuit reversed the district court for further proceedings to "develop the record regarding previously overlooked issues, to examine their factual foundations, and to explore their legal ramifications." *Id.* at 51. Its conclusion that the dormant interstate and foreign commerce clause are "essentially the same" was not fundamental to its ultimate holding and is therefore dicta. *See United States v. Turner*, 602 F.3d 778, 786 (6th Cir. 2010); *see also Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 459 (1st Cir. 1992).

Second, as mentioned previously, the Supreme Court expressly held that the standard for Congressional acquiescence to state actions for the dormant foreign commerce clause analysis is different from the dormant commerce clause analysis. *See supra* at 18. Thus, to suggest that the analysis for each of the two doctrines is the same requires ignoring the Court's holding that "Congress may more passively indicate," *Barclays Bank PLC*, 512 U.S. at 323, that state actions do not offend the dormant foreign commerce clause. It is therefore doubtful that the analysis is "essentially the same," *Antilles*, 408 F.3d at 46, given that the Court has instructed us to find no dormant foreign commerce clause violation when Congress passively indicates that its ability to speak with one voice is not offended. Because Congress has acquiesced to Michigan's Summer Fuel Law, we need not accept Ammex's invitation to determine whether Michigan's law fails the traditional dormant commerce clause.

For these reasons, Michigan's Summer Fuel Law does not offend the dormant foreign commerce clause.

B. Field and Conflict Preemption

Finally, Ammex argues that Michigan's Summer Fuel Law is preempted by federal law under a theory of field preemption and conflict preemption. Neither argument is persuasive.

1. Field Preemption

Under a theory of field preemption, "Congress' intent to supersede state law in a given area may nonetheless be implicit if a scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, if the Act of

Congress . . . touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 605 (1991) (internal quotation omitted) (alteration in original) (citations omitted). Ammex argues that "Congress has fully occupied the field regarding the types of goods that can be sold duty free, and there is no room for Michigan to require Ammex to adhere to its fuel standards." Appellant Br. at 35. The Supreme Court's opinion in *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 149–50 (1986) demonstrates otherwise.

In *R.J. Reynolds*, the Court assessed whether a State may impose a property tax on imported goods stored under bond in a customs warehouse and held that the State was not preempted from doing so. 479 U.S. at 152. The Court reasoned that the applicable statute and regulations did not "occupy a field completely" to preclude enforcement of state law. *Id.* at 149. Indeed, the Court observed "the current regulations, while detailed, appear to contemplate *some concurrent state regulation*." *Id.* (emphasis added); *see also Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60, 71 (1993) (recognizing this aspect of *R.J. Reynolds*'s holding).**[6]** Thus, Ammex's field preemption argument fails because the Court has expressly declined to conclude that Congress's establishment of an extensive field of regulations relating to duty bond warehouses operates to supplant all state regulation over bonded warehouses.

2. Conflict Preemption

Conflict preemption occurs "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *State Farm Bank*, 539 F.3d at 342 (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)). Thus, "to survive

---

**[6]**Although Ammex relies upon the Court's expansive language in *Xerox Corp. v. County of Harris*, 459 U.S. 145, 150 (1982) that "Congress established a comprehensive customs system," the Court subsequently limited those statements in *R.J. Reynolds*. *See R.J. Reynolds*, 479 U.S. at 143–44 ("[T]his court rather broadly stated that 'state property taxes on goods stored under bond in a customs warehouse are pre-empted by Congress' comprehensive regulation of custom duties.' . . . [H]owever, we accept *Xerox*'s holding and the quoted sentence as limited to the factual situation presented in that case, that is, where the goods are intended to transshipment." (internal citation omitted)). Thus, Ammex's reliance on *Xerox* for this proposition is misplaced, as this case does not involve goods intended for transshipment.

preemption analysis State law must not 'actually conflict' with the means Congress chose to effect its purpose." *Millsaps v. Thompson*, 259 F.3d 535, 548 (6th Cir. 2001) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). According to Ammex, Michigan's Summer Fuel Law is preempted in two ways: (1) Ammex could not simultaneously comply with federal law and state law during the summer of 2018 because Ammex could not sell gasoline duty free that complied with Michigan's RVP standards, and (2) Michigan's Summer Fuel Law "conflict[s] with Congress's goals for duty-free stores even when Ammex can source 7.0 psi RVP gasoline that complies with customs law." Appellant Br. at 37.

Simultaneous compliance with Michigan's Summer Fuel Law and federal customs law is not a physical impossibility. Indeed, Ammex acknowledged that it was able to comply with both statutes from 2013 through 2017. Ammex contends that it now cannot comply with both state and federal law because it does not have an available supplier. This is not a conflict caused by Michigan's Summer Fuel Law, but by a problem caused by a law of an entirely different sort— the law of supply and demand.[7] But it cannot be said that compliance with both state and federal laws is a physical impossibility.

Further, Michigan's Summer Fuel Law does not "actually conflict" with Congress's goals for bonded warehouses. Although Congress has praised duty-free sales and observed that they "play a significant role in attracting international passengers to the United States," and are an "important source of revenue for the state, local and other governmental authorities," Omnibus Trade & Competitiveness Act of 1988, Pub. L. No. 100-418, § 1908(a), 102 Stat. 1107, 1315 (1988), it has never mandated that bonded warehouses sell gasoline duty free to carry out those objectives. Instead, Congress has broadly authorized that any good may be stored in bonded warehouses and made available for duty-free sale save "perishable articles and explosive substances other than firecrackers." 19 U.S.C. § 1557(a)(1). A merchant's temporary loss of the ability to sell one type of good is not inconsistent with Congress's goal of making a variety of types of goods available for sale. Indeed, as the district court rightly concluded, "the Summer-

---

[7]Ammex's previous gas supplier is "now undergoing repairs and maintenance." R. 29, PageID 851. Presumably, Ammex's source of gasoline that complies with both federal and state law will be available to it once again after the repairs are complete.

Fuel Laws do not prohibit Ammex from selling any good" because "consistent with the purpose of customs bonded warehouses generally, . . . they certainly do not prohibit Ammex from selling any good duty free and tax free."  R. 34, PageID 929.  Thus, Michigan's Summer Fuel Law is not preempted.

## III.

Having concluded that Michigan's Summer Fuel Law neither offends the dormant foreign commerce clause nor is preempted by federal law, I agree with the Majority's conclusion to affirm the district court's judgment.  But the reasons why Michigan's Summer Fuel Law is constitutional do not rest on a premise that the law being enforced by MDARD is "federal law."  Rather, the state officials continue to enforce state law, but that law nonetheless survives scrutiny under the foreign commerce clause and is not preempted by federal law.